UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
JOSEPH AMBROSE, *et al.*,

                                    Plaintiffs,

- against -

CITY OF WHITE PLAINS, *et al.*,

                                    Defendants.
-----------------------------------------------------------------------x

**OPINION & ORDER**

No. 10-CV-4946 (CS)

Appearances
Joseph A. Maria
Frances Dapice Marinelli
Joseph A. Maria, P.C.
White Plains, New York
*Counsel for Plaintiffs*

John M. Flannery
Peter A. Meisels
Lalit K. Loomba
Eliza M. Scheibel
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
White Plains, New York
*Counsel for Defendants*

Richard K. Zuckerman
Matthew J. Mehnert
Lamb & Barnosky, LLP
Melville, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 375.)  For the

following reasons, the Motion is GRANTED.

## I.    BACKGROUND

The following facts, which are from the parties' Local Rule 56.1 submissions and supporting materials, are undisputed unless otherwise noted.[1]

### A.    The Parties

Plaintiffs are former City of White Plains ("City") police officers who were hired prior to July 1, 1995 and retired prior to May 24, 2010.  (56.1 Stmt. & Resp. ¶ 25; Ps' 56.1 Counterstatement ¶ 1.)  Defendants are the City; the City's mayor, Thomas Roach, (56.1 Stmt. & Resp. ¶ 17); the City's Chief of Staff/Corporation Counsel, John Callahan, (*id.* ¶ 18); and John Kirkpatrick, Benjamin Boykin, II, Dennis E. Krolian, Milagros Lecuona, John Martin, and Beth N. Smayda, who are members of the City's Common Council, (*id.* ¶¶ 19-24).

### B.    The Collective Bargaining Agreements

Throughout their employment with the City, Plaintiffs were represented by the Police Benevolent Association of the City of White Plains, Inc. ("PBA").  (*Id.* ¶ 26.)  Plaintiffs are not

---

[1] In their original summary judgment submission in opposition to Defendants' motion, Plaintiffs submitted a Local Rule 56.1 Statement, (Doc. 388), which did not comply with my Individual Rule 2.C.i, in that Plaintiffs failed to reproduce each statement of material fact listed by Defendants and insert their response thereto directly beneath.  At the Court's request, Plaintiffs submitted an amended Local Rule 56.1 Statement on February 5, 2018.  (Doc. 389.)  This second document, however, contained responses that were substantively different from Plaintiffs' original submission.  (*Compare, e.g.*, Doc. 388 ¶ 62, *with* Doc. 389 ¶ 62.)  On February 6, 2018, the Court issued an Order to Show Cause requiring Plaintiffs' counsel to re-submit their Rule 56.1 Statement and to explain why substantive changes were made.  (Doc. 390.)  Plaintiffs submitted a Corrected & Amended Response to Defendants' Rule 56.1 Statement and their Counterstatement of Material Facts, (Doc. 391 ("56.1 Stmt. & Resp.")), along with a letter from Plaintiffs' counsel Joseph A. Maria, and an accompanying affidavit from his associate, Frances Dapice Marinelli, to the effect that Ms. Marinelli used an old, unfiled draft of their 56.1 Statement responses when she sought to comply with the Court's request that Plaintiffs resubmit their 56.1 Statement in accordance with my Individual Rules. (Docs. 392-93.)  While Plaintiffs' counsel's conduct was, as they concede, a "serious mistake," (Doc. 392), their submissions in response to the Order to Show Cause suggest that it was careless but inadvertent, so I will consider Plaintiffs' 56.1 Response, as corrected and amended, (Doc. 391).

Plaintiffs' Counterstatement of Material Facts, (Doc. 391 at 34-96), does not continue the paragraph numbering from their responses to Defendants' statements, but begins again at one.  Thus, I will refer to Plaintiffs' responses to Defendants' 56.1 Statement as "56.1 Stmt. & Resp.," (*id.* at 1-34), and will refer to Plaintiffs' Counterstatement of Facts at "Ps' 56.1 Counterstatement," (*id.* at 34-96).  The Counterstatement violates Local Rule 56.1 because it is a narrative, much of which is undisputed, not a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Rule 56.1(b).

represented by the PBA in retirement.  (*Id.* ¶ 27.)  Between 1968 and the present, the City and

the PBA were parties to a series of collective bargaining agreements ("CBA"s).  (*Id.* ¶¶ 27, 28.)

Pursuant to New York's Taylor Law and the CBAs, all CBA provisions conferring economic

benefits to union members are subject to separate and independent approval by the City's

Common Council.  (*Id.* ¶ 29.)[2]  The CBAs do not contain a provision regarding health insurance

for retirees hired prior to July 1, 1995.  (*Id.* ¶ 40; *see* Doc. 377 ("Loomba Decl.") Exs. 2(a)-(v).)

The CBAs do, however, contain a provision discussing health benefits for current and some

retired employees; it is now codified as Section 11, entitled "Benefit Plans."  Also relevant is

what is now codified as Section 29(5), under the heading "General Provisions."

## 1.    Section 11

Section 11 of the recent CBAs – which formerly was codified in other sections – contains

three subsections addressing health benefits that are relevant here.  First, Section 11(A) states

that "[t]he existing employee benefit plans provided for the employees of the City with respect to

health insurance, Section 208-b of the General Municipal Law, and Sections 3 and 4 of Chapter

1005 of the Laws of 1965 shall remain in full force and effect."  (56.1 Stmt. & Resp. ¶¶ 43-44;

---

[2] Plaintiffs object to this statement of material fact.  Plaintiffs do not explain why or how they object to Defendants' statement that the CBAs are subject to separate and independent approval, but add their own statement that "Both parties are subject to the applicable provisions of law and to the appropriation of funds by the Common council," without any evidentiary support.  (*Id.*)  This pattern of objecting to Defendants' statement of fact and providing a generalized response (sometimes not directly addressing the statement and sometimes in the form of a legal argument) appears throughout Plaintiffs' responses.  Local Rule 56.1 requires that "[e]ach statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  Failure to do so permits the Court to deem the fact admitted.  *See Cruz v. Wykoff Heights Med. Ctr.*, No. 13-CV-8355, 2016 WL 4533568, at *1 (S.D.N.Y. July 19, 2016) (deeming admitted responses without citation to specific evidence); *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 12-CV-1484, 2015 WL 1223797, at *1 n.1 (E.D.N.Y. Mar. 17, 2015) ("Statements in the [defendant's 56.1 statement] to which plaintiff objected but failed to provide a citation to the evidence as required by Local Rule 56.1(d) are not considered disputed.").  I have "broad discretion to determine whether to overlook [Plaintiffs'] failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).  Given Plaintiffs' track record in this case with attention to detail (or lack thereof), and the fact that the record is so voluminous, meaning Plaintiffs are in a much better position than the Court to search it for facts helpful to them, I will deem admitted all statements to which Plaintiffs object but as to which they fail to provide evidentiary support.

Loomba Decl. Ex. 2(s) at 11.)[3] This section has remained essentially unchanged since 1968. (56.1 Stmt. & Resp. ¶ 42.)

Second, the substantive provision regarding current employees' health insurance, now-Section 11(C), has changed minimally since 1968. (*Id.* ¶ 44.) The City and the PBA agreed in the 1970-72 CBA that, "Effective July 1, 1971, the City shall contribute 100% of the cost of family coverage under the 'State-Wide Plan.' An equivalent dollar amount shall be contributed on behalf of those employees electing G.H.I. family plan." (*Id.* ¶ 45; Loomba Decl. Ex. 2(b) at 4.) During the negotiations for the 1972-1973 CBA, the PBA urged that the CBA be amended to read, "Effective July 1, 1972, the City shall provide identical health insurance coverage to all previously retired members of the Police Department not covered under our present insurance plan. The City shall assume [the] full cost of this benefit." (56.1 Stmt. & Resp. ¶ 48 (alteration in original); Loomba Decl. Ex. 8 § 9.) The City rejected the proposed addition. (56.1 Stmt. & Resp. ¶ 49.) In the 1989-1991 CBA, the city and PBA agreed that employees appointed on or after January 1, 1990 would contribute 25% towards the cost of their health insurance premiums for the first five years of employment. (*Id.* ¶ 50; Loomba Decl. Ex. 2(m) at 7.) Section 11(C) of the 2005-2008 CBA, reads "Health Insurance. The City shall continue to contribute 100% of the cost of family coverage under the 'N.Y.S. Empire Health Insurance Program.'" (*See* Loomba Decl. Ex. 2(s) at 11.) "Employees appointed on or after January 1, 1990, shall contribute twenty-

---

[3] General Municipal Law Section 208-b and Sections 3 and 4 of Chapter 1005 of the Laws of 1965 provide death benefits for certain City employees who die within one year of and as a result of an injury sustained in the performance of the employee's duties. (Ds' 56.1 ¶ 43 n.3.) In reproducing Defendants' statements of material fact, Plaintiffs neglected to include Defendants five footnotes and accompanying charts. Thus, "Ds' 56.1" refers to Defendants' original Local Rule 56.1 Statement of Material Facts. (Doc. 376.)

five (25%) perfect of the cost of the health insurance plan in which they are enrolled until they have completed five (5) years of service within the Police Department." (*Id.*)[4]

Third, during negotiations for the 1993-1997 CBA, the City and the PBA negotiated a provision addressing retiree health insurance. (56.1 Stmt. & Resp. ¶ 51.) The provision – which is now Section 11(D) entitled "Retiree Health Insurance" – provides, in relevant part:

> Employees hired on or after July 1, 1995 and who are otherwise eligible to receive health insurance benefits in retirement from the City shall be entitled to maintain the level of health insurance benefits (individual or family) enjoyed by the employee at the time of retirement and to have the City contribute premiums pursuant to the following schedule:

| COMPLETED YEARS OF CITY SERVICE | CITY CONTRIBUTION |
| --- | --- |
| 20 OR MORE | 100% |
| 15-19 | 80% |
| 10-15 | 50% (INDIVIDUAL) |
| | 35% (FAMILY) |
| LESS THAN 10 | 0% |

(Loomba Decl. Ex. 2(o) at 3-4; Doc. 384 ("Marinelli Aff.") Ex. 17 at 11.) The provision did not have an effect on employees or retirees who were hired before July 1, 1995. (56.1 Stmt. & Resp. ¶ 55.)[5]

In 2015, the Common Council adopted a Stipulation of Agreement reached between the City and the PBA after negotiations, which extended for a period of six years the CBA that had

---

[4] The PBA and the City reached an impasse in their discussions for the 2008-2010 CBA and submitted their disagreement to an arbitrator. (*See* Loomba Decl. Ex. 2(t).) The arbitrator's opinion and award decided twelve outstanding issues, none of which involved health insurance for retirees. (*See id.* at 27-43.)

[5] Plaintiffs object to this statement of material fact, citing fourteen exhibits with no pincites and stating that an attorney for Defendants assured the then-PBA president that the new provision "did not affect health insurance benefits of retirees who were hired on or before July 1, 1995." (*Id.*) I deem the statement admitted because: (1) the alleged statement by the attorney is consistent with Defendants' assertion; and (2) Plaintiffs cannot reasonably expect the Court to search hundreds of pages of depositions for the portions that might be helpful to them, so their citation to evidence is tantamount to no evidence at all. More examples of this practice appear elsewhere in Plaintiffs' 56.1 Statement and Response (and brief), such as citing to "Exs. 18 through 146, Ex. 137, 22-26.'" (56.1 Stmt. & Resp. ¶ 39.) "Rule 56.1 requires a party to provide pinpoint citations; this Court is not required to look for the proverbial 'needle in a haystack.'" *Sch. for Language & Commc'n Dev. v. N.Y.S. Dep't of Educ.*, No. 02-CV-269, 2006 WL 2792754, at *1 n.1 (E.D.N.Y. Sept. 26, 2006).

expired on June 30, 2012.  (56.1 Stmt. & Resp. ¶¶ 136-37; Loomba Decl. Ex. 2(v) at 1.)  The

Stipulation of Agreement made certain changes to the existing CBA, including the addition of

the following provision:

> Employees hired before July 1, 1995, who retire on or after July 1, 2015 and who
> are otherwise eligible to receive health insurance benefits in retirement from the
> City, shall continue to be entitled to maintain the level of health insurance benefits
> (individual or family) enjoyed by the employee at the time of retirement and to have
> the City contribute 100% of the appropriate percentage of premiums charged by the
> New York State Empire Health Insurance Program under any of the health
> insurance programs the City makes available to its employees.

(Loomba Decl. Ex. 2(v) at 13.)  The same negotiations resulted in other changes to the CBA,

including changes to salary for newly-hired police officers, Municipal Law § 207-c procedures,

and drug testing procedures.  (56.1 Stmt. & Resp. ¶¶ 141-42.)

## 2. Section 29(5)

Since 1968, all CBAs have contained a paragraph under the "General Provisions" section

that addresses other employee "rights and benefits."  (56.1 Stmt. & Resp. ¶ 57.)[6]  In the 1968-

1970 CBA, the provision provided:  "It is likewise understood and agreed that all employees'

rights, benefits and prerogatives which presently are or may be enjoyed by an employee not

specifically conceded in this agreement are reserved to the employee."  (*Id.* ¶ 58; Loomba Decl.

Ex. 2(a) at 7.)  During the negotiations for the 1970-1972 CBA, the PBA sought to add a

paragraph to the clause, which stated:

> Notwithstanding any provision contained in this Agreement, nothing herein shall
> be deemed to limit, restrict, or remove any benefit, right or other thing which each
> police officer of the City of White Plains may now have or be entitled or may
> hereafter be entitled, pursuant to rules, regulations or other directives heretofore
> established, nor shall it be in derogation of any right or remedy which any member

---

[6] Plaintiffs refer to this clause as the "Past Practice Clause," while Defendants refer to it as the "Rights and Benefits
Clause."  (*Id.*)  To simplify and provide clarity, I will refer to this clause throughout this Opinion & Order as Section
29(5), as that is where it is currently codified.

may now be entitled to or may hereafter be entitled to pursuant to any rule, regulation or other directive heretofore established.

(56.1 Stmt. & Resp. ¶ 59.) Ultimately, the City and the PBA limited the clause to read, "It is understood and agreed that all employees' rights and benefits which are presently enjoyed but not specifically covered in this Agreement shall be maintained." (Loomba Decl. Ex. 2(b) at 9; *see* 56.1 Stmt. & Resp. ¶ 61.)

During the 1972-1973 bargaining, the PBA sought to add after "rights and benefits" in the first sentence the phrase "and all existing practices and procedures," as well as an additional paragraph, stating:

> Furthermore, notwithstanding any provision contained in this agreement, nothing herein shall be deemed to limit, restrict, remove, revoke, or diminish any benefit, right, or other thing which each employee of the Police Department may now have or be entitled or may hereafter be entitled or which may exist by reason or usage. Furthermore, the provisions of this agreement and of this section shall supersede any present or hereafter adopted rule or regulation or other formal Department directive or any other City action present or future.

(56.1 Stmt. & Resp. ¶ 62.) The 1972-1973 CBA did not change the preexisting language. (*Id.* ¶ 64.)

During the 1975-1976 negotiations, the City sought to remove the clause altogether, (*Id.* ¶ 65; Marinelli Aff. Ex. 11 at 6), while the PBA demanded that the clause be expanded to read, "The City shall not eliminate any rights or benefits all practices of the past which were previously, and are presently, enjoyed by the members which are not specifically covered in this agreement," (56.1 Stmt. & Resp. ¶ 65 (emphasis omitted)). The dispute went before an arbitrator, who, after a Findings of Fact and Recommendations, decided in a Final and Binding Opinion and Award that there would be no change to the clause. (*Id.* ¶¶ 66-67.)

In the negotiations for 1978-1980, the PBA demanded that the following language be added to the agreement:

> All benefits enjoyed in the previous agreement shall be continued until such time as a successor agreement is reached. It is hereby stipulated and agreed by and between the City of White Plains and the White Plains PBA that any and all rights, benefits and privileges which are presently in effect under the last contract or by incorporation of past practices, shall be continued in full force and effect until such time as a new contract is signed. All terms of the previous agreement shall be continued unless expressly amended by the terms of the new agreement.

(*Id.* ¶ 68; Loomba Decl. Ex. 13 at 5.) During these negotiations, the PBA and the City agreed that they were conducted on a "package basis and unless a mutually agreeable package resulted both parties would revert back to their original demands upon declaring an impasse." (Loomba Decl. Ex. 13 at 3.) The clause remained unchanged. (56.1 Stmt. & Resp. ¶ 69.)

During negotiations for the 1983-1985 CBA, the City and the PBA agreed to narrow the scope of the clause; it was changed to read: "It is understood and agreed that all employees' rights and benefits which are terms and conditions of employment and which are presently enjoyed but not specifically covered in this Agreement shall be maintained." (*Id.* ¶¶ 71-72; Loomba Decl. Ex. 2(j) at 24.) The clause, which is now codified as Section 29(5), (*see* Loomba Decl. Exs. 2(l)-(s)), has remained unchanged since the 1983-1985 CBA. (56.1 Stmt. & Resp. ¶ 73.)

## C.    History of Resolutions and Ordinances

Until May 10, 2010, the City had a practice of covering 100% of the cost of health insurance premiums for retired police officers, including Plaintiffs. (*Id.* ¶ 31.)[7] This practice

---

[7] Plaintiffs respond to this statement of material fact by reciting their argument that the CBAs contain a clause that explicitly requires the City to pay 100% of retirees' health insurance premiums and citing to the decision of a 1994 arbitration panel, (Loomba Decl. Ex. 2(n)), and four of their own exhibits, which total approximately seventy pages, (Marinelli Aff. Exs. 9-11, 14). Such a response presents several problems, each of which is pervasive throughout Plaintiffs' 56.1 Response. First, this response is more of an argument as to why Defendants are liable for breach of contract and Contract Clause violations, among other things, not a response to the factual statement Defendants offered. Because Plaintiffs do not dispute the City's practice of paying 100% of the cost of health insurance premiums prior to May 10, 2010, I deem this assertion of fact and others like it, (*see, e.g.*, 56.1 Stmt. & Resp. ¶¶ 34, 35, 38), admitted.

Second, the manner in which Plaintiffs filed their exhibits on ECF is haphazard at best; the order of the exhibits on ECF does not correspond with the Marinelli Affirmation or the courtesy copies provided to chambers. The

was reflected in a Common Council Resolution on November 20, 1967 ("1967 Resolution"), which stated "that the City of White Plains, as a participating employer in the State Employees Health Insurance Plan, elects to pay the full cost of premium or subscription charges for the coverage of city employees and retired city employees who are enrolled in the basic state-wide health insurance plan and the city will pay one-half of the cost of premium or subscription charges for the coverage of the dependents . . . of such city employees and retired employees." (Loomba Decl. Ex. 3; 56.1 Stmt. & Resp. ¶ 32.)[8]

In 1996, the City adopted an ordinance, codified at Section 2-5-54 of the White Plains Municipal Code, providing that employees hired on or after July 1, 1995 were required to contribute to the cost of health insurance in retirement according to a schedule set forth in the ordinance. (56.1 Stmt. & Resp. ¶ 34.) On April 5, 1999, the City adopted an ordinance, which added a provision to Section 2-5-54 of the City Code, which stated:

> Notwithstanding any of the foregoing provisions to the contrary, the above schedule shall not apply to employees whose positions are designated in Appendix 1, Appointed Officials and Appendix 1c, Elected Officials. Such employees who are otherwise eligible to receive health insurance benefits in retirement from the City, shall continue to be entitled to maintain the level of health insurance benefits (individual or family) enjoyed by the employee at the time of retirement and have the City contribute 100% of the premium.

(Marinelli Aff. Ex. 5 at 2.)

On May 24, 2010, the City passed the ordinance at issue, (the "2010 Ordinance"), which for the first time addressed retirement health benefits for retirees hired prior to July 1, 1995, and

---

attachments to Doc. 384 filed on ECF contain portions of Plaintiffs' 56.1 Statement and Response and what seem to be random portions of other exhibits. All references to Plaintiffs' exhibits contained within this Opinion & Order are to the exhibits as listed in the Marinelli Affirmation.

Finally, Plaintiffs cite to four exhibits, three of which have about 20 pages, with no pin cites. Such a citation is akin, as noted, to providing no citation at all. *See Sch. for Language & Commcn's Dev.*, 2006 WL 2792754, at *1 n.1.

[8] Plaintiffs object to this statement of fact, stating, among other things, that "[t]he resolution was in effect for forty-two (42) years." (*Id.* ¶ 32.) Plaintiffs provide no citation for this proposition, and in any event, it is not responsive to Defendants' statement regarding the parameters of the Resolution. Thus, I deem the statement admitted.

stated in pertinent part:

> Employees hired before July 1, 1995, who are otherwise eligible to receive health insurance benefits in retirement from the city, shall continue to be entitled to maintain the level of health insurance benefits (individual or family) provided by the city to current employees and to have the city contribute eighty-five percent of the premium charged by the New York State Empire Health Insurance Program toward the cost of providing individual or family coverage under any of the health insurance programs the city makes available to its employees. The provision of this section shall not apply to retired employees covered by a collective bargaining agreement at the time of their retirement, during the term said collective bargaining agreement is in effect.

(56.1 Stmt. & Resp. ¶ 36; Loomba Decl. Ex. 5 at 4.) The 2010 Ordinance capped the City's contribution toward the health insurance of retirees who were hired before July 1, 1995 at 85% of the cost of the New York State Empire Health Insurance Program ("NYSHIP"). (56.1 Stmt. & Resp. ¶ 37.) The retirees, including Plaintiffs, "are required to contribute the difference, if any, between (i) the figure equal to 85% of the cost of the NYSHIP premium and (ii) the premium cost of the health insurance plan in which the retiree is enrolled." (*Id.* ¶ 38.) If an employee or retiree opts to receive health insurance under NYSHIP, they would be responsible for paying 15% of the cost of premiums, which, as of January 2017, ranges from $63.21 per month for individual coverage for Medicare-eligible retirees and to $324.10 per month for family coverage for employees or retirees not eligible for Medicare coverage. (*Id.* ¶ 103.)

In addition to NYSHIP, the City offers five alternative plan for retirees, including: (1) Empire Blue Cross and Blue Shield Medicare plan, (2) Emblem Health Insurance – Access 1 plan, (3) Emblem Health – Prime HMO plan, (4) Emblem Health HIP – VIP Medicare plan, and (5) Benistar/TransAmerica ("Benistar"). (*Id.* ¶ 120; Doc. 379 ("Guzman Aff.") ¶ 2.) Benistar provides coverage for retirees and their family members who are Medicare eligible with a premium cost of $438.83 per family member, or $877.66 for a family of two. (56.1 Stmt. & Resp. ¶¶ 122-23; Guzman Aff. ¶ 4-5.) Comparatively, 85% of the NYSHIP premium for a

family of two Medicare eligible persons is $947.44 per month. (Guzman Aff. ¶ 6.) Thus, a family of two Medicare-eligible persons could obtain coverage under Benistar for no cost. (*Id.* ¶ 7.) Benistar may be more expensive than NYSHIP on an individual basis. (*See* Marinelli Aff. Ex. 155 at 3.) Plaintiff John Bonner testified that in 2012 or 2013 he switched to a plan "where you didn't have to pay a premium [and] it would be covered in full by the City," but that he later switched back to NYSHIP because the plan was "a disaster" because he "had to use doctors in New York and had to get services – hospitals had to be . . . in New York." (*Id.* Ex. 25 at 20:18-21:25.) He did not recall what plan it was. (*Id.* Ex. 25 at 20:18-21:2, 24:16-18.) In any event, Plaintiffs admit that both NYSHIP and Benistar provide nationwide coverage, (56.1 Stmt. & Resp. ¶ 127), the office visit co-payment and co-payments for prescriptions for both plans is the same, (*id.* ¶¶ 128-29), and neither plan charges a deductible for hospitalization or doctors' visits as long as the patient uses in-network providers, (*id.* ¶ 130).[9]

### D.    Alleged Promises by Municipal Employees

During the Plaintiffs' respective depositions, Plaintiffs were asked to describe the basis for their promissory estoppel claims – specifically, whether they were relying on any oral statements as a basis for their claim – and to describe the damages that they are seeking. (*Id.* ¶¶ 144-45.) Based on the Court's request at the pre-motion conference on September 26, 2016, Defendants grouped Plaintiffs into five categories for purposes of this motion: Plaintiffs who claim to have relied on: (1) statements by PBA representatives; (2) statements by Police Commissioners; (3) statements by Mayors or members of the Common Council; (4) statements by lower-level City employees; and (5) documents. (*Id.* ¶ 146; *see* Ds' 56.1 Appendix A

---

[9] Plaintiffs state that "[t]he in-network providers are not the same and are not the doctors who have treated Plaintiffs over the years," (*id.*), which I interpret to mean that Benistar and NYSHIP do not have the same in-network providers, and that Plaintiffs have been seeing doctors who are not in-network under the Benistar plan, although Plaintiffs provide no evidentiary support for this statement.

("Appendix A").)[10] Each of the deposed Plaintiffs claimed reliance on one or more of the above categories. (56.1 Stmt. & Resp. ¶ 147.)[11]

### E.  The City's Financial Distress

In the wake of the Great Recession, the City has been experiencing fiscal distress and decreased revenues. (*Id.* ¶¶ 81-82.) For example, the City's General Fund decreased by about $9 million. *See* Office of the Commissioner of Finance, The Comprehensive Annual Financial Report for the Fiscal Year July 1, 2008 – June 30, 2009, at 40, https://www.cityofwhiteplains. com/ArchiveCenter/ViewFile/Item/80 ("2008-2009 Annual Report").[12]

On December 18, 2009, Moody's Investors Service gave the City a credit rating of Aa1, but projected a "negative outlook [that] reflects [a] narrowed financial position that is expected to narrow further in fiscal 2010." (56.1 Stmt. & Resp. ¶ 111; Genito Aff. Ex. A at 2.) At the start of the 2009-2010 fiscal year, the City's revenue budget lines were overestimated by almost $5.2 million, and expenditures – including salaries and wages – were underestimated. (56.1 Stmt. & Resp. ¶ 85.) In the 2010-2011 proposed budget, the 2009-2010 fiscal year deficit was projected to be as high as $13 million. (*Id.* ¶ 86.)

---

[10] Plaintiffs object, arguing that the grouping of the Plaintiffs into five categories is "a question of law and improper Statement pursuant to Rule 56.1." (56.1 Stmt. & Resp. ¶ 146.) But I asked the parties to group the Plaintiffs into categories to aid the Court in analyzing the promissory estoppel claim. (Minute Entry dated Sept. 26, 2016.) Thus, not only was it proper for Defendants to create these categories, but they did so at the Court's request. Moreover, Plaintiffs do not argue that any of the categories are misleading, inaccurate, or not supported by the record. In fact, Defendants' Appendix A includes detailed citations to the record to indicate on what each Plaintiff relied, and Plaintiffs have pointed to nothing to the contrary.

[11] Contrary to Plaintiffs' objection that this statement is conclusory, Appendix A includes a row for every remaining Plaintiff and contains a specific citation to the record for each. (*See* Appendix A.)

[12] Defendants state that the City's General Fund expenditures exceeded revenues by $9 million. (56.1 Stmt. & Resp. ¶ 83.) The 2008-2009 Annual Report to which they cite, however, shows that the City's revenues exceeded its expenditures. But when transfers for other financing sources and uses were taken into account, the fund balance at the end of the year was approximately $9 million less than the fund balance at the beginning of the year. (*See* 2008-2009 Annual Report at 40.) Plaintiffs' objection does not create an issue of material fact because they only state "Objection. Conclusory and self-serving," (*id.*), without refuting the report on which Defendants' Commissioner of Finances relies in his affidavit, (Doc. 378 ("Genito Aff.")).

In January 2010, the Mayor and Common Council took steps to reduce the City's expenditures, including consolidating management positions, implementing two rounds of layoffs in February and April, making $939,000 in cuts to other personnel costs, and changing the timing of health insurance payments. (*Id.* ¶ 87.) After these changes, the City was still facing a deficit of approximately $7 million at the end of the 2009-2010 fiscal year. (*Id.*)

In preparing for the 2010-2011 fiscal year budget, the City took several steps to decrease its deficit. The City's administration estimated that it would need to increase the real property tax rate by 23.5%, assuming that the City could limit new expenditures to an increase of only 2%. (*Id.* ¶ 88.) When the 2010-2011 budget was proposed in April 2010, the property tax rate increase had to be 18.9% to accommodate the deficit, even with no increase in expenditures. (*Id.*) To further increase revenues and reduce the proposed increase in the property tax rate, the city proposed increases in fees and charges for the departments of recreation and parks, public works, parking and building, and the youth bureau. (*Id.* ¶ 89.) The City consolidated several management positions and left others unfilled and unfunded, which reduced management salaries and wages by approximately 20% – from $7.4 million to $5.9 million. (*Id.* ¶ 90.) Finally, the administration proposed $4 million in savings in personnel costs and layoffs through negotiations with unions, including 21 layoffs from the PBA and Firefighter union's bargaining units. (*Id.* ¶¶ 92, 94.)

Even after these cuts, however, the property tax increase would have to have been 9%. (*Id.* ¶ 94.) A 9% increase would have been higher than the increased imposed by nearby cities in Westchester County such as New Rochelle and Yonkers. (*Id.* ¶ 95.) To further reduce the property tax increase, the Common Council proposed and approved an additional $1.5 million in savings, $500,000 of which was achieved by requiring retirees to contribute a percentage of their

health insurance premiums. (*Id.* ¶ 96.)[13] This proposal was memorialized in the 2010

Ordinance. (*Id.* ¶ 101.) As a result of requiring retirees to contribute to their health insurance

premiums, the City had to increase the tax rate for the 2010-2011 fiscal year by only 6.85%, (*id.*

¶ 99), an increase that would be more palatable to taxpayers and less off-putting to developers.

On June 24, 2011, Governor Andrew Cuomo signed the Tax Cap Law (Chapter 97 of the New

York State Laws of 2011), which restricted the amount by which real property taxes could be

increased to the lesser of two percent or the increase in the rate of inflation. (*Id.* ¶ 109.) Since

then the City has increased the real property tax levy by the maximum amount allowed each year

under this law. (*Id.*; *see id.* ¶ 110.)

   The City took several other steps to alleviate its financial stress. For example, in October

2009, the City imposed a 3% tax on the price of a hotel room in the City. (*Id.* ¶ 116.) In 2010,

the City sold $1.2 million worth of taxi medallions. (*Id.* ¶ 117.) And on May 10, 2010, the

Common Council adopted an ordinance that increased the sales tax rate by .25%. (*Id.* ¶ 118.)

   Since the 2010 Ordinance, the City has continued to experience financial distress, (*see id.*

¶¶ 106, 108), with some modest improvements, (*see id.* ¶ 112). In 2013, Moody's restored the

"negative outlook" to "stable," noting that "[t]he revision of the outlook to stable reflects the

city's demonstrated ability to restore reserve levels, movement towards a trend of structural

balance, and the elimination of non-capital B[ond] A[nticipation] N[ote] issuance," but also

warned that the rating could go down if the City failed "to demonstrate continued progress." (*Id.*

¶ 112.) From fiscal year ended June 30, 2007 through fiscal year ended June 30, 2016, the total

_____

[13] Confusingly, Plaintiffs note in response to this statement that "[t]hese proposals did not violate the City's contractual obligations and were not a subject for negotiation." (*Id.*) "These proposals" ultimately led to the adoption of the 2010 Ordinance at issue here, (*id.* ¶ 101), so it defies logic that Plaintiffs would respond that the proposals did not violate the City's contractual obligation, considering such a violation is at the heart of Plaintiffs' suit. Perhaps Plaintiffs meant to respond that these proposals did violate the City's contractual obligations as to retirees other than Plaintiffs.

taxable assessed value of real property in the City has declined from $296 million to $277 million, and the estimated full valuation of taxable real property in the City has declined from $9.1 billion to $8.4 billion. (*Id.* ¶ 108.) While the City continues to have a Moody's Aa1 rating on its bonded debt, Moody's issued a credit report in February 2017 noting that the City is "challenged" by an "elevated debt and pension burden." (*Id.* ¶ 107.)

### F. <u>Arbitration</u>

On or about June 23, 2010, the PBA filed a grievance on behalf of all bargaining unit members hired before July 1, 1995 – which did not include Plaintiffs, as they had all already retired, (*see* Marinelli Aff. Ex. 4)[14] – that the City had violated Sections 11(A), (C), and (D), as well as Section 29(5), of the CBAs by passing the 2010 Ordinance. (56.1 Stmt. & Resp. ¶ 74.) The City denied the grievance on or about July 5, 2010, (*id.* ¶ 75), and the PBA filed a demand for arbitration shortly thereafter, (*id.* ¶ 76). On July 11, 2011, arbitrator Arthur Riegel issued an Opinion and Award denying the PBA's grievance in its entirety (the "Arbitration Opinion and Award"). (*Id.* ¶ 77.) On October 6, 2011, the PBA filed a petition in New York Supreme Court, Westchester County, seeking to vacate the Opinion and Award. (*Id.* ¶ 78.) On June 6, 2012, the Westchester County Supreme Court issued a Decision and Order denying the PBA's petition and confirming the Arbitration Opinion and Award. (*Id.* ¶ 79.)

### G. <u>Procedural History</u>

The procedural history in this case is lengthy and complicated. Plaintiffs[15] brought this action on June 25, 2010, (Doc. 1), and filed an Order to Show Cause for Preliminary Injunction

---

[14] Plaintiffs state that Plaintiff Robert Wilhelm was the last to retire on December 12, 2007, (56.1 Stmt. & Resp. ¶ 28), but the chart Plaintiffs provided with their submissions indicates that Plaintiff Daniel Jackson was the last to retire on January 1, 2010. (*See* Marinelli Aff. Ex. 4 at 2.)

[15] Throughout the course of this litigation, the makeup of the Plaintiffs has changed. The original complaint named 143 Plaintiffs. (Doc. 1 ¶¶ 6-149.) The amended complaint named 169 Plaintiffs. (Doc. 82 ¶¶ 6-175.) For a full summary of the procedural history of various Plaintiffs being added and dropped, see 56.1 Stmt. & Resp. ¶¶ 3-15.

and Temporary Restraining Order the same day, (Doc. 2).  On July 7, 2010, Judge Stephen C. Robinson, who originally presided over this case, granted Plaintiffs' request for a preliminary injunction, (Doc. 16), which Defendants appealed on August 6, 2010, (Doc. 21).  On August 31, 2010, Defendants Adam T. Bradley (then the mayor) and defendant John Callahan filed a motion to dismiss.  (Doc. 32.)  On October 26, 2010, the case was re-assigned to me, (Doc. 41), and on November 4, 2010, I so-ordered a stipulation discontinuing all claims against Defendants Bradley and Callahan in their individual capacities, (Doc. 42).  The remaining Defendants moved to dismiss on January 28, 2011, (Doc. 54), and by Decision & Order dated September 30, 2011, I granted that motion in part and denied it in part, (Doc. 83).  On the same date, I vacated Judge Robinson's preliminary injunction.  (Doc. 85.)

Plaintiffs filed an amended complaint on May 17, 2011, (Doc. 82), and a Second Amended Complaint on October 20, 2011, (Doc. 96), which Defendants moved to dismiss on May 7, 2012, (Doc. 113).  On December 14, 2012, I denied Defendants' motion to dismiss without prejudice and allowed Plaintiffs to file a Third Amended Complaint.  (Doc. 122.)  On January 25, 2013, Plaintiffs filed their Third Amended Complaint, (Doc. 125), which Defendants moved to dismiss on April 23, 2013, (Doc. 130).  On December 4, 2013, I issued an oral ruling denying Defendants' motion to dismiss the Third Amended Complaint.  (Doc. 138.)  Defendants filed their Answer to the Third Amended Complaint on December 26, 2013, (Doc. 145), and the parties proceeded into discovery.

On October 14, 2016, with leave from the Court, Plaintiffs' filed a Fourth Amended Complaint adding one claim.  (Doc. 334 ("FAC").)  The FAC contains four claims:

---

Plaintiffs' request to substitute the Estate of Plaintiff Thomas Grady (Vicki A. Grady, co-Trustee) as Plaintiff in place of Thomas Grady is granted.  (*See id.* ¶ 11.)  Plaintiffs' request to stay various now-deceased Plaintiffs' cases is denied.

(1) impairment of Plaintiffs' federal constitutional rights under the Obligation of Contract Clause, Article I, Section 10, Clause 1, in violation of 42 U.S.C. § 1983; (2) breach of the CBAs under state law; (3) promissory estoppel under state law; and (4) violation of the Equal Protection Clauses of the United States and New York State Constitutions. (FAC ¶¶ 349-66.)

Defendants now move for summary judgment, arguing that (1) the Court should defer to the Arbitration Opinion and Award regarding Plaintiffs' breach of contract claim, but even if it does not, that claim fails based on the plain language and history of the CBAs; (2) the Contract Clause claim fails because there was no breach of the CBAs but even if there was, the 2010 Ordinance did not substantially impair the alleged contractual relationship, and the 2010 Ordinance was reasonable and necessary to serve a legitimate public purpose due to the City's fiscal emergency; (3) Defendants are entitled to summary judgment on the promissory estoppel claim because none of the individuals upon whom Plaintiffs relied for the promise that they were to receive a 100% contribution toward their health insurance premium had the authority to so promise; and (4) Plaintiffs' equal protection claim fails because Plaintiffs are not a suspect class and there is a legitimate interest in treating Plaintiffs differently than active employees who obtained full health premium payments in retirement by making other concessions to the City. (*See* Doc. 382 ("Ds' Mem.").)

Plaintiffs respond that (1) there are issues of material fact that bar the Court from granting summary judgment; (2) the 2010 Ordinance violates the Contract Clause because the City breached a contractual agreement, which caused substantial impairment to Plaintiffs, and for which there was no legitimate public purpose because the City was not in fiscal distress; (3) Defendants failed to show a rational relationship to a legitimate state interest sufficient to dismiss

the equal protection claim;[16] (4) Plaintiffs' promissory estoppel claim should stand because Plaintiffs reasonably relied on various City employees and documents; and (5) the Court should not defer to the Arbitration Opinion and Award. (*See* Ps' Opp.)

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated

---

[16] Plaintiffs also refer to a due process claim under the Fourteenth Amendment.  (Doc. 387 ("Ps' Opp.") at 14.)  This claim, however, was dismissed with prejudice in 2011 at the motion to dismiss phase.  (Doc. 83 at 47.)

speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Affidavits in opposition to a motion for summary judgment "must be based upon concrete particulars, not conclusory allegations." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451 (2d Cir. 1999) (internal quotation marks omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Id.* at 452; *see Major League Baseball Props.*, 542 F.3d at 310 ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . .").

## III.   DISCUSSION

### A.   Contract Clause

#### 1.   Legal Framework

The Contract Clause of the United States Constitution, (Article I, Section 10, Clause I), provides, in relevant part:  "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  Yet the Contract Clause is necessarily limited by the state's sovereign power to protect the health, safety, and welfare of its citizens.  *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).  Courts use a three-part test to determine when a state's power is limited by the Contract Clause:  "(1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate."  *Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 993 (2d Cir. 1997); *see Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006).

#### 2.   Contractual Relationship

I first must determine whether the City had a contractual obligation to provide Plaintiffs with no-cost health insurance in retirement.  *See Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186-87 (1992).  Defendants first argue that the Court should afford substantial deference to the Arbitration Order & Award.  (Ds' Mem. at 2-4.)  They then argue that even if the Court does not defer to the Arbitration Order & Award, the CBAs' plain language does not obligate the City to contribute 100% of Plaintiffs' health insurance premiums in retirement, and that the CBAs' legislative history supports such a reading.  (*Id.* at 4-16.)

### a. *Deference to Arbitration Order & Award*

In my oral ruling on Defendants' motion to dismiss Plaintiffs' Third Amended Complaint on December 4, 2013, I held that the Arbitration Order & Award, subsequently confirmed by the New York Supreme Court, Westchester County, was not entitled to preclusive effect, in part because Plaintiffs were not represented by the PBA – the sole movant in the Arbitration – at the time. (Minute Entry dated Dec. 4, 2013.) Defendants now argue that even though Plaintiffs are not barred by the doctrines of *res judicata* or collateral estoppel from relitigating their breach of contract claim, the Court should grant substantial deference to the Arbitration Order & Award. (Ds' Mem. at 2-4.) Plaintiffs respond by emphasizing the evidentiary differences between arbitrations and trials. (Ps' Opp. at 21.)

The mere fact of the procedural and evidentiary differences between arbitrations and trials does not mean that courts can never defer to an arbitrator's reasoning. But the context in which courts typically defer to an arbitration award's reasoning is when the court is directly reviewing it for purposes of either enforcing or vacating it. *See, e.g.*, *United Bhd. of Carpenters & Joiners of Am. v. Tappen Zee Constructors*, 804 F.3d 270, 275 (2d Cir. 2015). Defendants have provided no authority for the proposition that courts should defer to an arbitrator's reasoning in a case alleging a separate, albeit related, breach of contract claim. And where, as here, the parties in the arbitration did not represent the plaintiffs' interests, I need not substantially defer to the Arbitration Order & Award.[17]

---

[17] I note, however, that the arbitrator came to his generally well-reasoned decision after considering substantially similar evidence, (*see* Ds' 56.1 Appendix D), save for the alleged existence of a benefits booklet and five Plaintiffs' testimony about PBA negotiations, (*see* Ds' Mem. at 3). While I have engaged in independent analysis, I come to the similar conclusions as Mr. Riegel for similar reasons.

### b. Contractual Obligations

Plaintiffs argue that the plain language and negotiating history of Section 29(5) of the CBAs show that it clearly confers a contractual obligation on the city to provide Plaintiffs with no-cost health insurance in retirement. Defendants argue that Section 29(5)'s plain language, which is unambiguous, confers no such obligation.[18]

"[T]he words employed in the agreement must be given their plain meaning," and the agreement must be "construed to accord a meaning and purpose to each of its parts." *Siebel v. McGrady*, 566 N.Y.S.2d 736, 738 (3d Dep't 1991) (citations and internal quotation marks omitted); *see Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*, No. 99-CV-11681, 2000 WL 1341546, at *4 (S.D.N.Y. Sept. 18, 2000) ("The primary objective in interpreting a contract is to give effect to the intent of the parties 'as revealed by the language they chose to use.'") (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). If the language of the contract is undisputed and unambiguous, the interpretation of that contract is a question of law to be decided by the Court. *See Cue Fashions, Inc. v. LJS Distribution, Inc.*, 807 F. Supp. 334, 336 (S.D.N.Y. 1992) ("[T]he language of the relevant contract is neither disputed nor ambiguous and, in these circumstances, contract interpretation is a matter of law."); *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 367 N.Y.S.2d 492, 494-95 (1st Dep't 1975) ("It is well recognized that the construction of a plain contract involves a question of law and is a matter for the court to determine from the terms contained in such contract.").

---

[18] Plaintiffs failed to respond to Defendants' argument that the 2010 Ordinance did not violate the three relevant portions of Section 11. (*See* Ps' Opp. at 9.) Because Plaintiffs failed to address Defendants' arguments on this issue, Plaintiffs' claim that Defendants breached Section 11 is deemed abandoned. *See Marache v. Akzo Nobel Coatings, Inc.*, No. 08-CV-11049, 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) (claim abandoned by virtue of plaintiff's failure to address it in his opposition to defendant's summary judgment motion) (collecting cases), *adopted by* 2010 WL 3731124 (S.D.N.Y. Sept. 7, 2010); *Arias v. Nasdaq/Amex Mkt. Grp.*, No. 00-CV-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as abandoned where plaintiff's opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment). Accordingly, I will address only Section 29(5).

Section 29(5)'s language is undisputed; the parties presented the CBAs to the Court in support of this motion and their content is not questioned. Defendants argue that the contract is unambiguous, and thus the Court need not consider the provision's negotiating history. Plaintiffs do not state whether they believe the contract is unambiguous, but touch on both Section 29(5)'s plain meaning and negotiating history. "Under New York law, . . . the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). Contract language is unambiguous where the words have "'a definite and precise meaning, unattended by danger of misconception in the purpose of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)). Ambiguous language is defined as "that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden*, 959 F.2d at 429 (internal quotation marks omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). "If the terms of the contract are unambiguous, the obligations it imposes are to be determined without reference to extrinsic evidence." *Id.* Here, even though the parties disagree as to Section 29(5)'s meaning, only one interpretation is reasonable when reading the provision in the context of the CBAs as a whole. Thus, Section 29(5) is both unambiguous and undisputed, and the interpretation of the provision is a question of law for the Court.

Section 29(5) has had three primary iterations since 1968. (*See* Loomba Decl. Ex. 2(a) at 7; *id.* Ex. 2(b) at 9; *id.* Ex. 2(j) at 24.) In all of its forms, Section 29(5) refers to the rights and benefits of "employees." (*See id.*) Defendants argue that I have already decided that Plaintiffs are not "employees" for purposes of the CBA. (Ds' Mem. at 5.) In my Decision and Order dated September 30, 2011, in finding that Plaintiffs were not obligated to follow the grievance procedures in the CBAs, I stated that "Plaintiffs, all of whom are retired, are not City 'employees.'" (Doc. 83 at 39.) I came to this conclusion because the CBA section enumerating the grievance procedure contained a "Definitions" subsection, which stated that "[u]nless otherwise expressly stated, the following terms shall, *for purposes of this Article*, have the following meanings." (Loomba Decl. Ex. 2(r) at 23 (emphasis added).) Section 24(2)(D) – the Section to which I was referring in my prior decision – defines an employee as "any person covered by the recognition clause of this Agreement excluding the Chief of the Bureau of Police," which includes "uniformed employees of the City's Police Department who have the designation of police officer." (*Id.* at 1, 23.) As I previously held, retired officers are not "uniformed employees." (Doc. 83 at 39-40.) Even though that definition only technically applies to the article addressing grievances, the agreement should be read as a whole. Thus, this definition of "employees" should extend throughout the CBAs, particularly because the CBAs refer to both "retirees" and "employees," demonstrating that the agreements intended to differentiate between the two. *See Bozetarnik v. Mahland*, 195 F.3d 77, 82 (2d Cir. 2002) ("In interpreting a collective bargaining agreement, we read the contract as a whole, and we construe individual phrases in their context, not in isolation."). Further, that a retiree is not an employee makes common sense and is consistent with common parlance.

But it does not follow that Plaintiffs not being employees necessarily means that Section 29(5) does not aid them. If the City's 100% contribution to retirees' health insurance premiums is (1) not specifically covered elsewhere in the CBA, and (2) a "term and condition of employment," then Plaintiffs' right to their retirement benefits arguably vested and thus could sustain a claim for breach of contract.

Section 29(5) covers "employees' rights and benefits which are terms and conditions of employment and which are presently enjoyed *but not specifically covered* in this Agreement." (Loomba Decl. Ex. 2(j) at 24 (emphasis added).) The City's obligations with respect to contributing to retirees' health insurance premiums, however, are covered elsewhere in the CBA. Section 11(D), entitled Retiree Health Insurance, lays out the amount the City must contribute to retirees' health insurance premiums for those who were hired on or after July 1, 1995. (*See* Loomba Decl. Ex. 2(r) at 10-11.) Section 11(D) does not cover those who were hired before July 1, 1995. The canon of construction of *inclusio unius est exclusio alterius* dictates that when "contract language expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." *Hirsch v. Qingdao Orien Commercial Equip. Co.*, No. 12-CV-952, 2015 WL 1014352, at *12 (E.D.N.Y. Mar. 6, 2015) (internal quotation marks omitted); *see Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("[G]uidance is provided by the doctrine of '*inclusio unius est exclusio alterius*,' an applicable maxim when interpreting contracts."). Under this canon, it can be inferred that the parties to the CBAs intentionally excluded retirees who were hired before July 1, 1995 from the Retiree Health Insurance section, and thus that that section covers everything the parties intended to say about

retiree health insurance premiums. Because the City's obligation to contribute to retiree health benefits is already addressed in the CBA, Section 29(5)'s parameters do not apply.

Even if the term "not specifically covered in this Agreement" is read more narrowly – to mean, for example, that the CBA must address the specific issue of health insurance for retirees hired before July 1, 1995 – Plaintiffs still fail to bring themselves within Section 29(5) because retiree health benefits are not "terms and conditions of employment." "Terms and conditions of employment" is a term of art defined in New York's Taylor Law, New York Civil Service Law § 201 *et seq.*, which defines the issues government employers are obliged to negotiate with their employees' organizations. That statute specifically defines "terms and conditions of employment" as:

> salaries, wages, hours and other terms and conditions of employment provided, however, that such term shall not include any benefits provided by or to be provided by a public retirement system, or payments to a fund or insurer to provide an income for retirees, or payment to retirees or their beneficiaries. No such retirement benefits shall be negotiated pursuant to this article, and any benefits so negotiated shall be void.

N.Y. Civ. Serv. Law § 201(4). While Section 201(4) does not specifically mention retiree health benefits, it seems clearly to define "terms and conditions of employment" to refer to on-the-job practices, not retirement issues.

The New York Court of Appeals so held in the context of determining that a city's past practice of providing a 100% contribution to retirees' health insurance did not require that city to continue providing the same level of health benefits in the future. *See Aeneas McDonald Police Benevolent Ass'n v. City of Geneva*, 703 N.E.2d 745, 747 (N.Y. 1998). The Court there construed the phrase "terms and conditions of employment" in the context of Section 204(2) of the Taylor Law, which requires a city to "negotiate collectively with [an] employee organization in the determination of . . . the terms and conditions of employment of the public employees as

26

provided in this article, and to negotiate and enter into written agreements with such employee

organizations in determining such terms and conditions of employment." N.Y. Civ. Serv. L.

§ 204(2); *see City of Geneva*, 703 N.E.2d at 747. Under Section 204(2), "terms and conditions

of employment" cannot be changed unilaterally by the City but rather must be the subject of

mandatory bargaining. The *City of Geneva* Court held that retiree health benefits are not "terms

and conditions of employment," finding that while "[h]ealth benefits for *current employees* can

be a form of compensation, and thus a term of employment that is a mandatory subject of

negotiation," "a public employer's statutory duty to bargain does not extend to retirees." *City of

Geneva*, 703 N.E.2d at 747-48 (emphasis added). While *City of Geneva* did not involve contract

interpretation, the Court concluded that retirement benefits are not a subject of mandatory

negotiation because they are not "terms and conditions of employment" as defined in New

York's Taylor Law. *Id.*[19] The phrase "terms and conditions of employment" should carry with it

the same definition here, and thus retiree health benefits do not fall within Section 29(5).

Moreover, that phrase as it appears in Section 29(5) must be defined narrowly because

otherwise it would be superfluous. Under New York law, courts disfavor contract interpretations

that would render provisions of the contract superfluous. *Int'l Multifoods Corp. v. Commercial

Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (collecting cases); *see In re AMR Corp.*, 538 B.R.

213, 218 (Bankr. S.D.N.Y. 2015) ("[C]ourts should attempt to read collective bargaining

---

[19] Plaintiffs' argument that the past practice of providing retirees a 100% contribution toward their health insurance premiums also fails. First, courts should only look to the parties' past practice if the contract is ambiguous. *See Wilder v. World of Boxing, LLC*, 220 F. Supp. 3d 473, 479 (S.D.N.Y. 2016). But even if I did consider the City's past practice, an employer may unilaterally discontinue a past practice that is not contractually required if it is not subject not mandatory bargaining, as Defendants correctly point out. (Ds' Mem. at 15 (citing *Matter of Milonas v. Pub. Emp. Relations Bd.*, 648 N.Y.S.2d 779 (3d Dep't 1996)).) Because retirement benefits are not subject to mandatory bargaining, *see City of Geneva*, 703 N.E.2d at 748, the City had the right to unilaterally discontinue such a past practice by adopting the 2010 Ordinance. Finally, the distinction between employee health benefits and retiree health benefits in Section 11 stands in direct opposition to Plaintiffs' argument that the practice of offering a 100% contribution toward health insurance to retirees "shows that the City never made any attempt to differentiate the retiree benefit from the employee benefit and never retained unto itself the right to do so." (Ps' Opp. at 10.)

agreements in such a way that no language is rendered superfluous.").  Section 29(5) contains

two requirements for a "right or benefit" to be covered:  (1) it must be a term and condition of

employment *and* (2) it must be presently enjoyed but not specifically covered.  (Loomba Decl.

Ex. 2(r) at 31.)  If "term and condition of employment" were not given its meaning as defined in

the Taylor Law and by the Court of Appeals in *City of Geneva*, and instead just meant some

general right or benefit that employees possessed, the two requirements would be identical.

Because contracts should be construed to give meaning to each phrase, "terms and conditions of

employment" must carry with it the definition in the Taylor Law – a state statute specifically

designed to address labor disputes between public employees and their employers.  *See* N.Y.

Civil Serv. L. § 200 ("[I]t is the public policy of the state and the purpose of this act to promote

harmonious and cooperative relationships between government and its employees and to protect

the public by assuring, at all times, the orderly and uninterrupted operations and functions of

government.").

Because Section 29(5) is unambiguous, I should not look extrinsic evidence.  *See Hunt

Ltd.*, 889 F.2d at 1277.  If I did, however, the interpretation above would be confirmed by the

clause's negotiating history.  In 1968, the clause stated that "all employees' rights, benefits and

prerogatives which presently are or may be enjoyed by an employee not specifically conceded in

this agreement are reserved to the employee."  (Loomba Decl. Ex. 2(a) at 7.)  Then, during

negotiations for the 1970-1972 CBA, the City and the PBA agreed to limit the clause to apply

only to rights and benefits "presently enjoyed;" it then read, "It is understood and agreed that all

employees' rights and benefits which are presently enjoyed but not specifically covered in this

Agreement shall be maintained."  (*Id.* Ex. 2(b) at 9.)  In 1983-1985, the City and the PBA agreed

upon the language as it currently exists, adding the phrase "which are terms and conditions of

employment." (*Id.* Ex. 2(j) at 24.) Each change in language was the result of negotiations between the PBA and the City, and a final CBA was adopted with agreement by both parties. If "terms and conditions of employment" was not intended to narrow Section 29(5) to mean something less than any right or benefit conferred upon employees, it would not have been added to the clause.

Finally, Section 29(5) does not render the 1967 Resolution a contract binding on the City. As Defendants point out, the 1967 Resolution has nothing to do with the plain language of Section 29(5). The 1967 Resolution does not render retirement benefits a "term and condition of employment." Moreover, a resolution is "a unilateral action that is temporary in nature and, thus, it does not create any vested contractual rights." *City of Geneva*, 703 N.E.2d at 748; *see Jewett v. Luau-Nyack Corp.*, 291 N.E.2d 123, 128 (N.Y. 1972) ("An ordinance provides a permanent rule of government or conduct designed to affect matters arising subsequent to its adoption. A resolution deals with matters of a temporary or special nature, where the action taken generally involves findings of fact and may be characterized as administrative.").[20] Thus, the subsequent CBAs, which are adopted by ordinance, and the 2010 Ordinance, trump the 1967 Resolution.

Because Plaintiffs and the City do not have a contractual relationship on the issue of health benefits for retirees hired before July 1, 1995, I "need not reach the question of impairment, as [I] hold that there was no contractual agreement regarding the specific . . . terms allegedly at issue." *Gen. Motors Corp.*, 503 U.S. at 186-87; *see N.Y. 10-13 Ass'n v. City of N.Y.*, No. 98-CV-1425, 1999 WL 177442, at *14 (S.D.N.Y. Mar. 30, 1999) ("[W]here no contractual agreement regarding the terms changed by the legislation exists, there is no need to consider

---

[20] That the 1967 Resolution could not create an irreversible commitment is evident from its language: "the City . . . *elects* to pay the full cost . . . ." (Loomba Decl. Ex. 3 (emphasis added).)

whether there was in fact an impairment and if so, whether such impairment was substantial.").

In an excess of caution, however, I will assume for the sake of argument that there is a

contractual agreement regarding health insurance for retirees hired prior to July 1, 1995, and will

discuss whether the 2010 Ordinance substantially impaired any such agreement, and if so,

whether it was a reasonable and necessary means to serve a legitimate public purpose.

### c. Impairment of Contract

Defendants argue that the 2010 Ordinance did not impair, much less substantially impair,

any alleged contractual relationship, but rather, if anything, any interference would be a simple

state law breach of contract. Plaintiffs do not respond to this argument, apparently conceding the

point, *see Scott v. JPMorgan Chase & Co.*, 13-CV-646, 2014 WL 338753, at *10 (S.D.N.Y. Jan.

30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) (summary order),[21] but I will reach it, again in

an excess of caution.

"The distinction between a breach of contract and an impairment of contract depends on

the availability of a remedy in damages. If a contract is merely breached and the duty to pay

damages remains, then the obligation of the contract remains and there has been no impairment."

*TM Park Ave Assocs. v. Pataki*, 214 F.3d 344, 349 (2d Cir. 2000) (citations and internal

quotation marks omitted); *see Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v.*

*Town Bd. of Town of Huntington*, No. 93-CV-2869, 1993 WL 735042, at *3 (E.D.N.Y. Sept. 15,

1993) ("The constitution does not provide a federal action for simple breach of contract."), *aff'd*,

31 F.3d 1191 (2d Cir. 1994).

---

[21] Plaintiffs do not address Defendant's distinction between impairment and breach of contract at all. To the contrary, Plaintiffs' primary argument is that the Court already determined that the 2010 Ordinance substantially impairs the CBAs. (Ps' Opp. at 12.) But that decision was rendered at the motion to dismiss phase, where Plaintiffs had only to plausibly allege such an impairment, and – more importantly – the briefing did not raise the issue of mere breach versus impairment.

The line between mere breach and unconstitutional impairment is crossed where the state or local government action forecloses the possibility of damages or an equivalent remedy. Thus, for example, where a state passes legislation that would prevent a local government from fulfilling its obligations under a contract, there is no available remedy, because the breaching local government is prevented by state law from performing. In such a case, a contract would be unconstitutionally impaired. On the other hand, where a city breaches a contract without a state legislative mandate as a defense, nothing generally prevents or excuses the city from performing its obligations, and thus the city will be liable for damages.

*Crosby v. City of Gastonia*, 682 F. Supp. 2d 537, 543-44 (W.D.N.C. 2010) (citations omitted), *aff'd*, 635 F.3d 634 (4th Cir. 2011). Thus, courts have held that if an ordinance that impacts a contractual relationship does not create a defense to a suit for breach of contract, it does not amount to an impairment. *See Horowitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1252 (7th Cir. 1996) (finding no impairment); *Crosby*, 682 F. Supp. 2d at 544 (same); *see also Gibson v. City of San Diego*, No. 12-CV-159, 2012 WL 12882141, at *4, 5 (S.D. Cal. Apr. 26, 2012) (ordinance modifying retiree health benefits did not impair contract because "if the City is liable for breach of contract, then the City will be required to pay damages for that breach").

Other courts have suggested that if the municipality's breach results from the enactment of a law, that is sufficient to raise the breach to the level of an impairment. *See E&E Hauling Inc. v. Forest Pres. Dist. of Du Page Cty., Ill.*, 613 F.2d 675, 680-81 (7th Cir. 1980) ("A resort to the use of law . . . must be considered to raise a claim under the contract clause."); *Am. Fed. of State, Cty. & Municipal E'ees Local 2957 v. City of Benton, Ark.*, No. 04-CV-492, 2005 WL 2244257, at *5 (E.D. Ark. Aug. 2, 2005) (finding impairment where city passed law that precluded itself from complying with contractual obligation).

It is difficult to reconcile these two lines of cases. On the one hand, the City used the force of law to limit its contribution to retirees' health benefits, which some courts have indicated is sufficient to raise a Contract Clause claim. And the Second Circuit has emphasized

the importance of not disrupting the reasonable expectations of municipal workers. *See Buffalo Teachers Fed'n*, 464 F.3d at 368.[22]

On the other hand, it is by no means clear that the 2010 Ordinance foreclosed monetary damages as a means to make Plaintiffs whole if they prevail. Indeed, it is expectation damages that Plaintiffs seek: Plaintiffs testified that if they prevail, they hope to receive, among other things, reimbursement of amounts they paid after the 2010 Ordinance went into effect. (56.1 Stmt. & Resp. ¶ 151; Appendix A.)

And nothing in the 2010 Ordinance indicates that the City would be forbidden from contributing 100% to retirees' health insurance; it merely states that employees hired before July 1, 1995 are "entitled to . . . have the [C]ity contribute eighty-five percent of the premium charged by" NYSHIP, (Loomba Decl. Ex. 5 at 4), meaning that the City *must* contribute 85%, but not that it can *only* contribute 85%. "Payment of public moneys as damages for breach of a contractual obligation on the part of . . . a municipality is not within the constitutional prohibition forbidding donations from the public purse." *Piro v. Bowen*, 430 N.Y.S.2d 847, 852 (2d Dep't 1980) (citing N.Y. Const. art. VIII § 1, and *Antonopoulou v. Beame*, 296 N.E.2d 247 (N.Y. 1973)). The New York State Constitution "requires that there be a legal obligation on the part of the . . . municipality before public funds can be paid to individuals," but "such a legal obligation may be either statutory or contractual." *Id.* Thus, if a court were to find that the CBAs required the City to contribute 100% to Plaintiffs' health insurance, the CBA would be the "contractual obligation" that would allow the City to pay public monies to Plaintiffs for breach of contract. This would include damages for the costs Plaintiffs have already incurred. Indeed, both parties

---

[22] Because that case involved a state law that prevented a city from complying with its contract, *id.* at 366-67, it was clear that the situation was not a simple breach by the city, but rather an impairment by the state. No analysis of the distinction was necessary, and thus the case sheds little light on whether the situation here is a mere breach or an impairment.

agree that damages for breach of contract remain available. Plaintiffs seek them in their second cause of action, and "Defendants . . . do not contend that Plaintiffs are precluded from pursuing their breach of contract claim." (Ds' Mem. at 19.)[23] Finally, I am guided by the canon of construction that "courts must construe statutes to avoid serious constitutional questions." *Single Source, Inc. v. Cent. Reg'l Tourism Dist., Inc.*, No. 08-CV-40176, 2011 WL 1877700, at *15 n.21 (D. Mass. May 17, 2011) (citing *Jones v. United States*, 529 U.S. 848, 857 (2000)).

Because the 2010 Ordinance does not bar the City from paying damages to Plaintiffs, any breach of the CBAs is not an impairment of contract under the Constitution, but rather a state law breach of contract.

### d. Substantial Impairment

Even if the 2010 Ordinance impaired the CBAs, Defendants argue that the impairment is not substantial because it was not reasonable for Plaintiffs to expect the City to pay 100% of the NYSHIP premium, and at least fifty-two Plaintiffs (fewer than half) could obtain equivalent healthcare at no additional cost. (Ds' Mem. at 20.) "'Total destruction' or repudiation of the contract is not necessary for an impairment to be substantial." *Donahue v. Paterson*, 715 F. Supp. 2d 306, 318 (N.D.N.Y. 2010) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26-27 (1977)). "Rather, [the Second] Circuit has stated that 'the primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations

---

[23] In *Carrier et al. v. Bradley et al.*, No. 10-CV-5044, I considered the same statute as it applied to retired firefighters and fire officers previously employed by the City of White Plains. (*See* No. 10-CV-5044, Doc. 95.) After I entered a preliminary injunction enjoining the City form implementing the 2010 Ordinance as it applied to plaintiffs there, both parties appealed. (*Id.* at 5-6.) After other proceedings at the district court level, the Second Circuit on appeal issued a mandate returning jurisdiction to this Court to consider, among other things, whether the 2010 Ordinance's language should "be construed as prohibiting White Plains from paying more than 85 percent of the premium, or as merely guaranteeing covered employees a minimum of 85 percent." (*Id.* at 7.) I found the former construction appropriate. But there the parties appeared to be in agreement that the 2010 Ordinance prohibited the City from contributing more than the dollar value of 85% of the cost of the NYSHIP plan. (*Id.* at 8 & n.9.) Consequently, I did not consider the issue as I should have. Upon further reflection, I now hold that the 2010 Ordinance does not prohibit the City from contributing more than the dollar value of 85% of the NYSHIP plan.

under the contract have been disrupted.'" *Id.* (quoting *Sanitation & Recycling*, 107 F.3d at 993).

That is, substantial impairments are those that "go to the heart of the contract," "affect [the]

terms upon which the parties have reasonably relied," or "significantly alter the duties of the

parties." *Id.*

Defendants urge that N.Y. Civil Service Law § 167(2), which sets the floor for the City's

contributions to retirees' health insurance at 50% for individual retirees and 35% for dependents,

makes it unreasonable for Plaintiffs to rely on a 100% contribution.  (Ds' Mem. at 20-21.)  But

Plaintiffs were told by various people working for the City that they would receive no-cost health

insurance in retirement.  (*See* Appendix A.)  Even if these individuals did not have the authority

to bind the City – an issue I need not reach in light of my disposition of Plaintiffs' promissory

estoppel claim, *see infra* Section III.C – their statements at least arguably rendered reasonable

Plaintiffs' expectations that they would receive no-cost health insurance in retirement.  And

Plaintiffs enjoyed decades of such no-cost health insurance.  That N.Y. Civil Service Law §

167(2) does not mandate such coverage does not mean that an employee's expectation of it,

based on other factors, is unreasonable.  Thus, it cannot be said that an impairment to a retiree's

health benefits is not substantial.  *See, e.g.*, *City of Benton*, 2007 WL 496760, at *2 (E.D. Ark.

Feb. 13, 2007) (impairment substantial because policy requiring some retirees to pay health

insurance "effectuated a fundamental change in the employee's expectations under the

Agreement"), *aff'd*, 513 F.3d 874 (8th Cir. 2008); *Mayborg v. City of St. Bernard*, No. 04-CV-

249, 2006 WL 3803393, at *12-13 (S.D. Ohio Nov. 22, 2006) (suspension of retirement medical

benefits substantial impairment).[24]

---

[24] The cases Defendants cite do not persuade me otherwise.  In *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, the Court held that the impairment might not have been substantial because the record was unclear as to when the contracts at issue were executed, and thus "it would be difficult for us to conclude what [plaintiff] should have expected at the time its contracts were executed."  141 F.3d 46, 53 (2d Cir. 1998).  In *Sanitation & Recycling*, the

Finally, Defendants argue that fifty-two Plaintiffs are eligible for an alternative plan, Benistar, which has a premium cost that is less than 85% of NYSHIP's premium cost. (56.1 Stmt. & Resp. ¶¶ 122-35.) While Defendants posit that Benistar provides comparable coverage to NYSHIP, (Guzman Decl. ¶¶ 8-12), Plaintiffs argue that Plaintiff John Bonner's testimony indicates that Benistar does not provide the same coverage as NYSHIP, (*see* 56.1 Stmt. & Resp. ¶ 122). But Bonner testified that he did not remember the name of the plan in which he enrolled, (Marinelli Aff. Ex. 25 at 20:18-21:2), and Plaintiffs point to no other evidence that Bonner had Benistar or that Benistar provided worse coverage than NYSHIP. In any event, I need not decide whether the contract rights of Plaintiffs who could switch to Benistar are substantially impaired in light of my holding above that, if anything, Defendants' interference was a mere breach of contract, not an impairment, and my holding below that Defendants had a legitimate purpose in enacting the 2010 Ordinance.

### e.    Legitimate Public Purpose

"When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law." *Buffalo Teachers Fed'n*, 464 F.3d at 368. "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Id.* (quoting *Sanitation & Recycling*, 107 F.3d at 993). The legitimate public purpose "need not be addressed to an

---

Second Circuit opined that the sanitation industry was heavily regulated, but did not decide whether the impairment was substantial, instead finding that even if it were, the law that impaired the plaintiffs' contractual relationship had a legitimate purpose. 107 F.3d at 994 ("Yet, we do not think we need to decide the precise degree to which these provisions of Local Law 42 impair contractual relationships."). And in *CFCU Cmty. Credit Union v. Little*, the state had amended the homestead exemptions at issue "several times" since 1962, making it foreseeable that it would do so again. No. 06-CV-1148, 2007 WL 2791122, at *4 (N.D.N.Y. Sept. 24, 2007). Here, Plaintiffs had expected to and did receive no-cost health insurance in retirement; the City had not made any changes pursuant to N.Y. Civil Service Law § 167(2) or otherwise.

emergency or temporary situation." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983).

Defendants argue that Plaintiffs bear the burden of establishing that the 2010 Ordinance did not serve a legitimate public purpose and was not reasonably necessary. (Ds' Mem. at 22.) Defendants misstate the law. While it is true that Plaintiffs must "produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct," *Buffalo Teachers Fed'n*, 464 F.3d at 365, which goes to the reasonable and necessary prong, *see id.* at 370, it is the government that "must show a significant and legitimate purpose behind the law," *id.* at 368. Further, on summary judgment it is the moving party that must show an absence of genuine issues of material fact on the point.

Nevertheless, Defendants meet their burden. "[C]ourts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest." *Id.* (collecting cases). Fiscal problems brought on by the so-called Great Recession that began in 2009 have been held to meet that standard. *See United Steel Paper & Forestry Rubber Mfg. Allied Industrial & Serv. Workers Int'l Union AFL-CIO-CLC v. Government of the Virgin Islands*, 842 F.3d 201, 211 (3d Cir. 2016) (government had legitimate public purpose in implementing salary cuts to unionized workforce in wake of fiscal problems brought on by economic recession in 2009) (citing *Energy Reserves Grp.*, 459 U.S. at 411-12); *Jones v. La. Bd. of Sup'rs of Univ. of La. Sys.*, 809 F.3d 231, 242 (5th Cir. 2015) (state had legitimate interest in addressing economic downturn triggered by Great Recession).

Defendants argue that the 2010 Ordinance was "enacted during a time of severe economic difficulty[, and] at a time when the City was facing significant budgetary problems." (Ds' Mem. at 22.) For support, Defendants produced warnings from Moody's that it projected a

negative outlook for the City, (56.1 Stmt. & Resp. ¶ 111); revenue budget lines that were overestimated by almost $5.2 million for the 2009-2010 fiscal year, (*id.* ¶ 85); a projection that same year that the deficit was to be as high as $13 million, (*id.* ¶ 86); and a decrease in the General Fund balance of about $9 million by the end of the 2008-2009 fiscal year, (2008-2009 Annual Report at 40). Moreover, the City was faced with having to either increase property taxes by a significant percentage or find cuts in the budget elsewhere. (*See* 56.1 Stmt. & Resp. ¶¶ 88, 94-95.) This effort to alleviate the City's fiscal crunch, while ensuring that the taxpayers did not bear an impracticable burden (as discussed below), is exactly the kind of remedy to a "general social or economic problem" the Second Circuit approved in *Buffalo Teachers Fed'n*. 464 F.3d at 368 (finding a wage freeze passed to alleviate a fiscal crisis was not "passed 'for the mere advantage of particular individuals;' rather, the legislature passed the law 'for the protection of a basic interest in society'") (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934)).

Plaintiffs note in their 56.1 Statement that the 2008-2009 Summary Adopted Budget "reports that the City 'is in sound financial condition' and benefits from 'the second highest rating given by the investment community,'" (Ps' 56.1 Counterstatement ¶ 168; Marinelli Aff. Ex. 156), but the 2008-2009 Summary Adopted Budget was signed on May 22, 2008, (Marinelli Aff. Ex. 156 at 7), and the economy did not see a downturn until the fall of 2008, *see V.M. Paolozzi Imports v. Am. Honda Motor Co.*, No. 12-CV-1052, 2015 WL 7776926, at *2 n.1 (N.D.N.Y. Dec. 2, 2015) ("To the extent that it is widely known that the U.S. economy experienced a recession beginning in the fall of 2008, the Court takes judicial notice of this fact."). That the City was optimistic in its 2008-2009 Summary Adopted Budget, signed before

the start of the recession, does not mean that the City did not experience fiscal distress leading up to the passage of the 2010 Ordinance.

Plaintiffs further argue in their brief that the "City's fiscal concerns . . . are belied by the facts stated in the [2008-2017] Summary Adopted Budgets which show the City has maintained its high (Aa1) credit rating with Moody's Investors Services." (Ps' Opp. at 13.) Plaintiffs say so without any support, pointing to nothing specific in any of the Summary Adopted Budgets or elsewhere to indicate that the City's fiscal concerns were overblown. While it is true that Moody's never decreased the City's credit rating, Moody's warned the City as early as December 18, 2009 that it projected a "negative outlook [that] reflects [a] narrowed financial position that is expected to narrow further in fiscal 2010." (Genito Aff. Ex. A at 2.) In fact, adjustments to the City's budget were done in an effort to maintain the Moody's rating. (*See* Marinelli Aff. Ex. 165 at 1 ("Since 1988, the City has maintained a high credit rating (Aa1) from Moody's Investors Service, and the FY 2010-2011 budget was [*sic*] been formulated to maintain that credit rating.").) The maintenance of the rating thus does not suggest the City's concerns were overblown, because the annual ratings reflect the belt-tightening measures the City undertook, including the 2010 Ordinance.

Further, each of the Summary Adopted Budgets contains statements in the Overview demonstrating the City's fiscal distress. In the 2009-2010 Summary Adopted Budget, the City stated that "[d]uring the past year, White Plains has felt the impact of the economic turmoil that has enveloped the nation," that "the city will likely finish the 2008-2009 fiscal year with a deficit in excess of $11 million," and that "Fiscal Year 2009-2010 will be no less challenging," citing "[t]he adopted operating budgets . . . [which are] down 3.0 million or 1.9% from last year's" and the "General Fund budget . . . [which] is $4.1 million or 2.7% less than the FY 2008-09 adopted

budget." (*Id.* Ex. 164 at 1.) The 2010-2011 Summary Adopted Budget notes that "[u]nlike [the City's] previous pattern of ending a fiscal year in a surplus or minor deficit, General Fund expenditures for fiscal year 2009 exceeded revenues by $8.9 million," and "[f]urther complicating the financial picture is the fact that major revenues as adopted in the budget for this fiscal year . . . were much too aggressive compared to actual results." (*Id.* Ex. 165 at 1.)

It is against this backdrop that the City passed the 2010 Ordinance. Plaintiffs' argument that the City was not in an economic downturn, without citation or explanation as to why these Summary Adopted Budgets should be disregarded or should be interpreted in another way, is insufficient to raise an issue of fact. "This is not a case in which the [2010 Ordinance was] passed for the mere advantage of particular individuals." *Buffalo Teachers Fed'n*, 464 F.3d at 368-69 (internal quotation marks omitted). Thus, Defendants have met their burden of showing a legitimate public purpose for passing the 2010 Ordinance. *See id.* (collecting cases).

### f.    Reasonableness and Necessity

An impairment is reasonable only if it is "specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling*, 107 F.3d at 993. Where the "state's legislation was self-serving to the state, [courts within the Second Circuit] are less deferential to the state's assessment of reasonableness and necessity than [they] would be in a situation involving purely private contracts." *Buffalo Teachers Fed'n*, 464 F.3d at 370. But "less deference does not imply no deference." *Id.* To be reasonable and necessary under less deference scrutiny, "it must be shown that the state did not (1) 'consider impairing the . . . contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.'" *Id.* at 370 (quoting *U.S. Trust Co.*,

431 U.S. at 30-31). Courts consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *PBA of N.Y.S. Troopers, Inc. v. New York*, 2012 WL 6020013, at *25 (N.D.N.Y. Dec. 3, 2012) (internal quotation marks omitted).

The City passed the 2010 Ordinance after several other measures failed to alleviate the City's financial distress. The City increased its sales tax percentage by 0.25% in 2010 shortly before the Ordinance was passed, even though it had raised the same tax by the same amount in 2008. (56.1 Stmt. & Resp. ¶¶ 84, 118.) In early 2010, the Mayor and Common Council consolidated management positions, implemented two rounds of layoffs, and changed the timing of health insurance payments. (*Id.* ¶ 87.) Then the City proposed increases in fees and charges for the departments of recreation and parks, public works, parking, and building, and the youth bureau. (*Id.* ¶ 89.) Two other unions, the CSEA and Teamsters, negotiated with the City to implement a plan that would create an additional $1.9 million in savings. (*Id.* ¶ 93.) And the PBA and Firefighters union had to implement twenty-one layoffs from their bargaining units for a savings of $2.1 million. (*Id.* ¶ 94.) After all of these changes, the City would still have had to increase the real property taxes by 9% to alleviate the financial burden, which was significantly higher than neighboring municipalities. (*Id.* ¶ 95.) The many measures taken before enacting the 2010 Ordinance suggest that it was a reasonable and necessary means to address the City's fiscal crisis. *See Buffalo Teachers Fed'n*, 464 F.3d at 371 (wage freeze reasonable and necessary because city took "more drastic measures" to alleviate financial stress before turning to freeze); *cf. Condell v. Bress*, 983 F.2d 415, 417, 420 (2d Cir. 1993) (lag payroll not reasonable and necessary where raising taxes, issuing debt, and layoffs not considered); *Ass'n of Surrogates &*

*Sup. Ct. Reporters within City of N.Y. v. State of N.Y.*, 940 F.2d 766, 773 (2d Cir. 1991) (lag payroll not reasonable and necessary in part because state did not consider available policy alternatives prior to implementing lag); *Donahue*, 715 F. Supp. 2d at 323 (state's measure was not reasonable and necessary because record did not reflect that the state considered and compared alternative options to fulfill the specific public purpose).

Plaintiffs' only argument as to why the 2010 Ordinance was not reasonable and necessary is, "Perhaps the City should be and have been more visitor friendly and realized more sale[s] tax revenue as opposed to 24 hour a day parking meters . . . with short time limits at one . . . dollar an hour which makes it impossible to have an enjoyable dinner without worrying about or getting a parking ticket." (Ps' Opp. at 23.) This proposition – which is not entirely clear – cannot satisfy Plaintiffs' burden to create a fact issue as to whether the City's actions were reasonable or necessary. While Plaintiffs' counsel apparently have a bee in their bonnets about the City's parking meters, that Defendants took steps to increase parking meter revenue actually helps Defendants' case. First, Plaintiffs provide no evidence suggesting that leaving the parking meters alone would have generated more visitors and more sales tax (or that increasing the meters' hours of operation caused a reduction in visitors and sales tax revenue). Second, that the City tried other measures such as increasing parking meter revenue shows it did consider more moderate alternatives. Finally, the inquiry does not require the Court to "second-guess the wisdom of picking the [2010 Ordinance] over other policy alternatives." *Buffalo Teachers Fed'n*, 464 F.3d at 372.

The undisputed facts indicate that the 2010 Ordinance was a matter of exigency that addressed a societal and economic interest and was appropriately tailored, and that other measures – including layoffs and significant increases in sales and property taxes – were

considered and implemented before resorting to it.  Bearing in mind that whether legislation violates the Contracts Clause does not turn on "[w]hether [it] is wise or unwise as a matter of policy," *Home Bldg. & Loan Ass'n*, 290 U.S. at 447-48, a rational factfinder would have to conclude that the 2010 Ordinance was reasonable and necessary to address the City's fiscal distress following the 2008 market crash, which was a legitimate public purpose.  Thus, even if there were a contractual obligation to Plaintiffs, their Contract Clause claim would be dismissed.

### B. Equal Protection

On October 14, 2016, with leave of the Court, Plaintiffs amended their complaint to add a claim that Defendants violated the Equal Protection Clause ("EPC") of the Fourteenth Amendment when, in June 2015, they negotiated and agreed with the PBA on a CBA, covering the years 2012-2018, which provided no-cost healthcare in retirement to retirees who were hired before July 1, 1995 and retired after July 1, 2015.[25]  Plaintiffs argue that the new provision impermissibly differentiates between retirees hired before July 1, 1995 who retired before and after July 1, 2015, in that only the former group (which includes Plaintiffs) would continue to have to contribute 15% toward their health insurance premiums.  (Ps' Opp. at 14-15.)

Defendants argue that Plaintiffs' EPC claim should be dismissed because Plaintiffs are not a protected class and treating the two groups differently bears a rational relationship to a legitimate state interest.  (Ds' Mem. at 43-45.)  Plaintiffs respond by pointing to similarities that

---

[25] Section 11(D) of the CBA was amended to read:

> Employees hired before July 1, 1995, who retire on or after July 1, 2015 and who are otherwise eligible to receive health insurance benefits in retirement from the City, shall continue to be entitled to maintain the level of health insurance benefits (individual or family) enjoyed by the employee at the time of retirement and to have the City contribute 100% of the appropriate percentage of premiums charged by the New York State Empire Health Insurance Program under any of the health insurance programs the City makes available to its employees.

(Loomba Decl. Ex. 2(v) at 13.)

both sets of police officers share and arguing (in conclusory fashion, without comment on Defendants' arguments on the point) that Defendants have failed to show a rational relationship to a legitimate state interest. (Ps' Opp. at 14-15.)

"Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against [an] equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981); *see Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015). Defendants need not "produce evidence to sustain the rationality of statutory classification;" rather "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks omitted). Plaintiffs concede that they are not members of a suspect class and that rational basis review applies. (*See* Ps' Opp. at 14-15.)

Defendants argue that the City and Common Council, in accepting the 2012-2018 CBA via ordinance, had "a legitimate interest in negotiating trade-offs and CBA terms with active employees that may differ from those of prior agreements." (Ds' Mem. at 45.) Plaintiffs were not members of the PBA at the time the 2012-2018 CBA was negotiated, and the City may rationally choose to provide better retirement benefits for active officers, compared to prior members, when (as here) those current members make other concessions. For example, the 2012-2018 CBA also put in place random drug testing and a reduction in police officer starting salaries, among other things. (56.1 Stmt. & Resp. ¶ 141.) Thus, as Defendants point out, "Plaintiffs are not similarly situated to the employees covered by the 2012-2018 CBA because they are not subject to the other concessions and trade-offs memorialized in the agreement."

(Ds' Mem. at 45.)  In the 2012-2018 CBA, PBA members traded these concessions for no-cost health insurance in retirement for members who served more than twenty years; Plaintiffs made no such bargain.  No reasonable jury could find that such a distinction between Plaintiffs on the one hand, and retirees hired before July 1, 1995 who had not retired as of July 1, 2015 on the other, was not rationally related to the legitimate interest of negotiating other concessions from active employees.  *See Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 755-57 (2d Cir. 1991) (distinction between "for service" retirees and police officers retired under other circumstances did not violate the EPC because city had legitimate interest in striking balance between two categories of retirees).  Plaintiffs' claim under the Fourteenth Amendment Equal Protection Clause is therefore dismissed.

C.     **Plaintiffs' State Law Claims**

In addition to their constitutional claims under federal law, Plaintiffs allege three claims under New York State law:  (1) breach of contract, (2) promissory estoppel, and (3) violation of the EPC of the New York State Constitution.  The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that all of the claims over which this Court has original jurisdiction should be dismissed, (Ds' Reply at 16 n.3), I decline to exercise supplemental

jurisdiction over Plaintiffs' remaining state-law claims. *See Kolari*, 455 F.3d at 122 (citing 28 U.S.C. § 1367(c)(3)).[26]

## IV. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The federal claims are dismissed with prejudice, and the state-law claims are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 375), enter judgment for the Defendants on the federal claims, and close the case.

**SO ORDERED**

Dated: April 2, 2018
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[26] In a case like this, which has been pending for some time and in which the Court has overseen substantial discovery and decided several substantive motions, it would be within my discretion to retain supplemental jurisdiction. *See Pane v. Town of Greenburgh*, No. 07-CV-3216, 2012 WL 12886971, at *5-6 (S.D.N.Y. Mar. 21, 2012). But Defendants have explicitly requested that I decline to exercise supplemental jurisdiction. (Ds' Reply at 16 n.3.) Because such a ruling will (if anything) redound to Plaintiffs' benefit, given that I tend to think that Defendants have the better of the remaining arguments, I decline in my discretion to retain jurisdiction.